1

2                **UNITED STATES DISTRICT COURT**

3                    **DISTRICT OF OREGON**

4                    **PORTLAND DIVISION**

5

6    CARMEN MICHELLE ALLEN,            )
                                       )
7              Plaintiff,              )    No. 03:11-cv-00001-HU
                                       )
8    vs.                               )
                                       )
9    MICHAEL J. ASTRUE,                )  **FINDINGS AND RECOMMENDATION**
     Commissioner of Social Security,  )
10                                     )
               Defendant.              )
11
                    _____
12

13

14   Carmen Michelle Allen
     5025 N. Vancouver Ave., #303
15   Portland, OR 97217

16        Plaintiff *pro se*

17

18   S. Amanda Marshall
     United States Attorney
19   Adrian L. Brown
     Assistant United States Attorney
20   1000 S.W. Third Avenue, Suite 600
     Portland, OR 97204-2904
21

22   David Morado
     Regional Chief Counsel, Region X, Seattle
23   Jordan D. Goddard
     Special Assistant United States Attorney
24   Social Security Administration
     Office of the General Counsel
25   701 Fifth Avenue, Suite 2900 M/S 221A
     Seattle, WA  98104-7075
26
          Attorneys for Defendant
27

28

     1 - FINDINGS & RECOMMENDATION

1

2    HUBEL, United States Magistrate Judge:

3        The plaintiff Carmen Michelle Allen seeks judicial review

4    pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision

5    denying her applications for Disability Insurance ("DI") benefits

6    under Title II of the Social Security Act, 42 U.S.C. § 1381 *et*

7    *seq.*, and Supplemental Security Income ("SSI") under Title XVI of

8    the Act.    Allen, appearing *pro se*[1], argues the ALJ erred in

9    rejecting the opinion of her treating physician, and finding her

10   testimony not to be fully credible.    In addition, Allen asks the

11   court to consider new evidence that was not presented to the ALJ or

12   the Appeals Council.    *See* Dkt. ## 18 & 23.

13

14                    *I.   PROCEDURAL BACKGROUND*

15       Allen protectively filed her applications for SSI and DI

16   benefits on June 15, 2007, at age 46, claiming disability since

17   June 9, 2007, due to arthritis, Lupus, obesity, a splenectomy,

18   congestive heart failure, "hypertension - benign essential," and

19

20   ─────────────────

21        [1]The court notes that Allen's reply brief is signed by her and
     by "Cynthia Maria Theresia Hymer, Plaintiff['] s Lay Advocate."
22   Dkt. #23, p. 10. Allen's opening brief is not signed, but her
     prayer for relief begins, "We pray for a reversal. . . ," leading
23   to the assumption that Ms. Hymer also assisted her with her opening
     brief.  Dkt. #18, p. 10.  "[A]gents or other persons, other than
24   attorneys," may represent claimants in Social Security agency
     proceedings if they comply with rules and regulations established
25   by the Commissioner. 42 U.S.C. § 406(a)(1).    However, only
     attorneys may represent parties other than themselves in this
26   court.  *See* LR 831(a).  However, the point appears to be moot, as
     Hymer has not submitted any declaration or other signed document,
27   and she appears simply to have assisted Allen in preparing her
     briefs.  Allen was represented by counsel at the ALJ hearing. (*See*
28   A.R. 26)

     2 - FINDINGS & RECOMMENDATION

"tobacco use."    (A.R.  120-35,  151[2])    Regarding  how  these
limitations affect her ability to work, Allen indicated, "The lupus
causes arthritis and vision problems.  It prevents me from standing
for more than about 10 minutes without pain, and from bending.
Congestive heart failure causes me to lose my breath quickly.  I
cannot  walk  upstairs  [sic].    My  high  blood  pressure  causes
migraines, which makes me go to the hospital almost every week."
(A.R. 151)

     Allen's applications were denied initially and on recon-
sideration.  (A.R. 60-63)  She requested a hearing, and a hearing
was held on January 5, 2010, before an ALJ.  Allen was represented
by counsel at the hearing. (*See* A.R. 26)  Allen testified on her
own behalf, and a Vocational Expert ("VE") also testified.  (A.R.
26-59)  On January 14, 2010, the ALJ issued his decision, denying
Allen's applications for benefits. (A.R. 8-19)  Allen appealed the
ALJ's decision, and on October 27, 2010, the Appeals Council denied
her request for review.  (A.R. 5-7)  However, the Appeals Council
later  set  aside  its  earlier  action  "to  consider  additional
information."  (A.R. 1)  The new evidence consisted of a Medical
Source  Statement  and  "Verification  of  Disability"  provided  by
Dr. Caroline Orsini.  (A.R. 4; 304-10)  On February 21, 2011, the
Appeals Council stated the new evidence did not warrant further

---

[2]The administrative record was filed electronically using the
court's CM/ECF system.  Dkt. #14 and attachments.  Pages of the
record contain three separate page numbers: two located at the top
of the page, consisting of the CM/ECF number (e.g., Dkt. #14-3,
Page 12 of 60); a Page ID#; and a page number located at the lower
right corner of the page, representing the numbering inserted by
the Agency.   Citations herein to "A.R." refer to the agency
numbering in the lower right corner of each page.

3 - FINDINGS & RECOMMENDATION

review of the ALJ's decision, and  it denied Allen's request for review (A.R. 1-4), making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. Allen filed a timely Complaint in this court seeking judicial review of the Commissioner's final decision denying her applications for benefits.   Dkt. #2.   The matter is fully briefed, and the undersigned submits the following findings and recommended disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

## II.   *FACTUAL BACKGROUND*

### A.  *Summary of the Medical Evidence*

On August 20, 2006, Allen saw a doctor at an urgent care clinic with a complaint of low back pain from a work-related injury that had occurred eight days earlier at her job as a checker at Fred Meyer.  She stated she had "twisted while picking something up and felt immediate low back pain."  (A.R. 219)  Allen denied numbness, tingling, motor weakness, or incontinence, and stated she had no history of prior back pain.  She was taking oxycodone regularly "for chronic knee pain due to arthritis in the knee," and she stated the medication was somewhat helpful for her back pain, but it did not relieve the pain completely. (*Id.*)  On examination, she exhibited tenderness in the left low back, and "some decreased range of motion with forward flexion."  (*Id.*)  She was diagnosed with a lumbar strain.  She was given a work release for four days, to return on the fifth day "without restriction at her request." (*Id.*)  She was referred to physical therapy and occupational medicine for followup, and a muscle relaxant was prescribed.  (*Id.*)

4 - FINDINGS & RECOMMENDATION

1    On November 15, 2006, Allen saw John R. Swartzel, M.D., her
2  primary care doctor, with complaints of increasing pain in both
3  knees.  Allen was still working at Fred Meyer, and stated she had
4  "great pain in the knees when climbing and descending stairs."
5  (A.R. 217; *see* A.R. 204)  The doctor ordered a number of laboratory
6  tests, a routine x-ray of Allen's chest, and x-rays of her knee.
7  Her weight was noted to be 292 pounds, and her blood pressure as
8  176/110.  Her only current medication was Roxicet[3], with no dosage
9  shown on the record.  (A.R. 204)

10   Allen was seen at an urgent care clinic on April 22, 2007,
11 "because she was concerned about elevation in her blood pressure."
12 (A.R. 217; *see* A.R. 208)  Her primary doctor, Dr. Swartzel, had
13 retired, so she saw a nurse practitioner at the clinic.  Her blood
14 pressure was elevated slightly at 149/92, and she was diagnosed
15 with hypertension "and stress reaction."  (A.R. 217)  Laboratory
16 tests were ordered, and medications were prescribed.  (*Id.*; A.R.
17 208)

18   On June 9, 2007, Allen saw a doctor at an urgent care clinic
19 for complaints of bilateral knee swelling.  (A.R. 205, 215-16)  She
20 was diagnosed with arthritis.  Lasix and oxycodone were prescribed
21 for joint pain.  (A.R. 216, 205)  Notes indicate doctors believed
22 her joint pain was "caused by a kind of arthritis called
23 osteoarthritis, or degenerative arthritis."  (A.R. 205)

24   On June 13, 2007, Allen saw a doctor at an urgent care clinic
25 with complaints of "worsening shortness of breath since her last
26 visit . . . on 6/9/07."  (A.R. 214)  Chest x-rays showed

27
28    [3]Roxicet is a pain reliever containing 5 mg of oxycodone and
   325 mg of acetaminophen.  *See* www.rxlist.com/roxicet-drug.htm.

5 - FINDINGS & RECOMMENDATION

"borderline cardiac enlargement without evidence of overt congesti[ve] heart failure," and no sign of pneumonia or neoplasm. (A.R. 226) The doctor's assessment was "(1) Congestive heart failure, although I do not think this is the primary cause of her shortness of breath given her very benign exam and normal BNP. (2) Shortness of breath. Normal D-dimer and normal exam dissuade from pulmonary embolus. (3) Hypertension is a clear diagnosis, pre-scribing Cozaar. (4) Allergies seasonal and perennial, prescribed loratadine." (A.R. 215) Allen was scheduled to follow up with her primary care provider on June 25, 2007. (*Id.*)

Allen saw family practitioner Michael P. Grace, M.D. on June 25, 2007, with complaints of ongoing bilateral knee pain, congestive heart failure, and Lupus. The doctor noted the following history of Allen's conditions:

> 1) Knee arthritis: on [Tylenol 3], taking every 4 hours, taking 2. Has been on for at least one year. Was on ibuprofen in the past, did not help. Pain located [bilateral] knees, aches around knee caps. Aching pain, tried ice packs. Gets swelling in knees. Worse with cold, painful to go up and down stairs. Never had [physical therapy].
>
> 2) CHF: was at work, was having trouble breathing, happened 2002. Took lasix, and improved. Now chronically on lasix, taking 1/day. Has [lower extremity] edema. . . . No orthopnea and no pnd [paroxysmal nocturnal dyspnea; i.e., shortness of breath and coughing at night]. No change in pillow requirement. Never had echo[cardiogram]. No [history] of asthma. Taking cozaar for [blood pressure], lasix for [lower extremity] swelling, and felodipine for [blood pressure].
>
> 3) Lupus: diagnosed 1979 in Providence in Portland. Was BB player for Portland [S]tate. Had "blood blisters" in mouth, and was "bleeding internally." Had low platelets, and by description, sounds as if she had sequestration of platelets by spleen and thus

6 - FINDINGS & RECOMMENDATION

had splenectomy. Since then, has been
sensitive to bright lights. Joint pains
started ~ 5 years, knees and ankles primarily
as above. No known kidney problems, may have
had malar rash unsure. Was on steroids for
this in the past.

(A.R. 212)

On examination, Allen's heart had a regular rate and rhythm,
with "no rubs, murmurs or gallops." (*Id.*) Her knees exhibited
slight effusion bilaterally and patellar crepitus was noted. She
had slightly limited flexion on the right, full extension
bilaterally, and full flexion on the left. McMurray's test[4] was
positive bilaterally. She had no valgus or varus knee deformity,
and no ACL injury. (A.R. 212-13) The doctor apparently examined
previous knee x-rays which showed "[s]ome mild medial joint line
narrowing, but no obvious [osteoarthritic] changes seen on AP
views. Some [question] of posterior patellar changes seen on
lateral views." (A.R. 213)

The doctor ordered new x-rays of Allen's knees, with a plan to
refer her to physical therapy. He ordered laboratory tests to
assess her report of Lupus, and an echocardiogram to assess her
congestive heart failure. He refilled her blood pressure medica-
tions, noting her blood pressure was "OK today." (*Id.*) Allen's
current medications were listed as Meloxicam[5] 15 mg, one tablet

---

[4]"The McMurray's test . . . is used to evaluate individuals
for tears in the meniscus of the knee." http://en.wikipedia.org/
wiki/McMurray_test (visited 04/06/12).

[5]Meloxicam is a medication used in the treatment of osteo-
arthritis. *See, e.g.*, www.rxlist.com/mobic-drug.htm.

7 - FINDINGS & RECOMMENDATION

twice daily; Cozaar[6] 100 mg, one tablet per day; a diuretic, one tablet per day; acetaminophen with codeine (300/30 mg.), one to two tablets every four to six hours as needed for pain; and Felodipine[7] 5 mg., once daily.  She was instructed to take the acetaminophen with codeine only if she was not getting relief from the Meloxicam. (A.R. 209-11)  Dr. Grace's records list the following as Allen's current medical problems, with the dates on which they were first noted, as follows:

| | |
|---|---|
| Lupus Erythematosus-Systemic | 5/21/2002 |
| Obesity | 5/21/2002 |
| Arthritis | 5/21/2002 |
| Splenectomy | 5/23/2002 |
| Tobacco Use | 8/5/2002 |
| CHF Congestive Heart Failure | 9/3/2002 |
| Arthritis-Knee | 10/8/2002 |
| Hypertension-Benign Essential | 4/1/2003 |
| Hyperlipidemia | 7/9/2007 |

(A.R. 210)

Bilateral standing knee x-rays taken on June 25, 2007, were compared with a similar study from March 11, 2003.  The x-rays showed "minimal narrowing of the medial compartment of the left knee similar to the March 2003 study suggesting mild degenerative or posttraumatic changes to the medial meniscus."  (A.R. 225)

---

[6]Cozaar is a medication used to treat hypertension.  *See* http://www.rxlist.com/cozaar-drug.htm.

[7]Felodipine is another medication used to treat hypertension. *See, e.g.* http://www.rxlist.com/plendil-drug.htm.

8 - FINDINGS & RECOMMENDATION

1    Laboratory test results showed a negative ANA (antinuclear
2    antibody) test; high C-reactive protein (3.1, where normal is less
3    than .9), indicating the presence of inflammation in the body; and
4    a high sedimentation rate (86, where normal is less than 21), also
5    indicating the presence of an inflammatory process.  Her white
6    blood count was somewhat elevated.  (A.R. 227)  Her fasting glucose
7    level was slightly above normal (102, where normal is less than
8    100).  (A.R. 228)  Her cholesterol also was high, at 266.  (A.R.
9    228-29)

10    On August 14, 2007, Allen saw Nurse Practitioner Kevin N.
11    Probst ("NP Probst") for followup.  Notes indicate he had some
12    doubt regarding Lupus as her diagnosis, indicating it was
13    "[q]uestionable . . . in the past verses [sic] ITP [abnormally low
14    platelet count of unknown cause]."  (A.R. 233)  Allen complained of
15    weight gain, and "problems with chronic fatigue and daytime sleepi-
16    ness."  (A.R. 234)  She denied any pain, swelling, rashes, or
17    problems with her upper extremities.  (*Id.*)  Further lab tests were
18    ordered to rule out an inflammatory condition.  Allen noted she had
19    been working for the past eighteen-plus years "on her feet doing
20    cashier-like work," but she recently had been "let go from her job
21    because of some health problems."  (*Id.*)

22    On September 5, 2007, family practitioner Richard Alley, M.D.
23    reviewed the record and completed a Physical Residual Functional
24    Capacity Assessment form.  (A.R. 262-69)  He opined Allen would be
25    able to lift up to twenty pounds occasionally and ten pounds
26    frequently; stand/walk for at least two hours in an eight-hour
27    workday, with normal breaks; sit for about six hours in an eight-
28    hour workday, with normal breaks; and push/pull without other

9 - FINDINGS & RECOMMENDATION

limitations.  He opined she should never climb ladders, ropes, or scaffolds, but she could do all other types of postural activities occasionally.  (*Id.*)  He noted Allen reported cooking, doing house-hold chores, driving, and shopping with help.  She stated she could walk for ten minutes before having to rest; she had "constant leg/hip/back/chest pain, can be up 1 hr and has [problems] with all postures and positions[.]"  (A.R. 269)  Dr. Alley opined "this level of disability is not supported by objective evidence and [Allen's] statements are found partially credible."  (*Id.*)  He noted Allen's lupus appeared to be inactive and her congestive heart failure minimal.  The restrictions he placed on her functional abilities were based on "her obesity, patellofemoral syndrome and knee [degenerative joint disease]."  (*Id.*)

On January 7, 2008, family practitioner Neal E. Berner, M.D. reviewed the record and concurred in Dr. Alley's findings.  (A.R. 270)

On February 7, 2008, neurologist Jacqueline Farwell, M.D. reviewed the record.  (A.R. 271-73)  She concurred with Dr. Alley, as well, except she indicated there was "no need to limit stooping, crouching, balancing, or climbing stairs."  (A.R. 271)  She noted Allen's "reported trouble getting around in her [activities of daily living] is not supported by her degree of disease."  (*Id.*)

On August 7, 2008, Allen saw Nurse Practitioner Fernando Carrillo ("NP Carrillo") at the Multnomah County Health Department to establish care as a new patient.  She had lost her medical coverage, and had run out of her blood pressure medications and her narcotic pain medication.  She signed an authorization for the clinic to obtain her prior medical records, to be reviewed prior to

10 - FINDINGS & RECOMMENDATION

1   any prescription for narcotics.  She was advised to return in two
2   weeks for followup.  (A.R. 300-01)

3       Allen saw NP Carillo again on August 21, 2008, for followup of
4   her hypertension.  Notes indicate Allen was taking her medication
5   as prescribed.  She was noted to be "homeless, living out of her
6   car."  (A.R. 299)  Allen asked if her prior records had been
7   obtained so she could renew her prescription for narcotic pain
8   medication; however, her records had not arrived, so she did not
9   receive the medication.  Notes indicate if the records had not
10  arrived in two weeks, new x-rays might be obtained of Allen's
11  knees; however, Allen did not return to the clinic.  (A.R. 299-300)

12      On February 3, 2009, Allen saw family practitioner Douglas
13  Lyon, M.D. to establish care.  Allen reported that she had traveled
14  to Las Vegas on January 5, 2009, for her birthday.  While there,
15  she had abdominal pain and was seen in the ER.  She was diagnosed
16  with "gallstone pancreatitis."  (A.R. 298)  An attempt was made to
17  remove the stones laparoscopically, but this was unsuccessful, and
18  she ended up having an open cholecystectomy.  She was in the
19  hospital for about one-and-a-half weeks.  She reported feeling well
20  and eating well, with no nausea or bowel problems.  Her weight was
21  noted to be 313 pounds.  Dr. Lyon removed half of Allen's staples,
22  and ordered followup lab tests.  Allen's scars were noted to be
23  well healed.  (A.R. 298)  She saw Dr. Lyon again on February 5,
24  2009, for removal of the remaining staples.  (A.R. 297)

25      Allen saw Dr. Lyon on February 26, 2009, for followup of her
26  blood pressure and weight management.  The doctor expected Allen to
27  be able to "return to normal activities by March 7th, 2009[,]" and
28  he recommended she return to swimming and water aerobics for

11 - FINDINGS & RECOMMENDATION

exercise.  He also advised her to "drop by the clinic once a week for a blood pressure check."  (A.R. 274)  Allen's blood pressure was poorly controlled, but she had not taken one of her medications that morning.  (A.R. 296)  She was advised of the role her weight played in her high blood pressure, and was encouraged to exercise and lose weight. She was noted to be 5'4" tall, with a weight of 304 pounds.  (A.R. 296-97)

On March 27, 2009, Allen saw Dr. Lyon for followup.  She reported "[e]xercising daily [and] feeling better."  (A.R. 293) Allen "[e]xpress[ed] [a] desire to get on 'disability.'" (*Id.*)  In that regard, Dr. Lyon noted, "Disability seeking behavior – patient with many skills and good education, should be able to find work, I explained to her I would not support her quest for disability." (A.R. 294)

Allen saw Dr. Lyon on April 24, 2009.  She reported feeling well, and being in the pool "most every day."  (A.R. 292)  She reported having "difficulty getting around without pain."  (*Id.*) Her diagnoses were listed as "Hypertension NOS," "Systemic Lupus Erythematosus," "Obesity NOS," "Anomalies of Spleen," and "Congestive Heart Failure, Unspec." (*Id.*)  Notes indicate there was no suspicion that Allen was abusing her pain medications or diverting from taking them as prescribed.  (A.R. 293)

As of November 5, 2009, Allen's medications were listed as blood pressure medications, a medication to prevent low blood potassium levels, a diuretic, Tylenol with Codeine every four to six hours as needed for pain, and ibuprofen 600 mg three times daily for inflammation.  (A.R. 291)

12 - FINDINGS & RECOMMENDATION

On July 3, 2010, Dr. Orsini signed a form entitled "Verification of Disability" to support Allen's receipt of housing assistance under title 18 of the U.S. Code. Dr. Orsini checked boxes indicating Allen "is disabled." (A.R. 304)

On July 27, 2010, family practitioner Caroline Orsini, M.D. completed a medical source form at the request of the Social Security Administration regarding Allen's functional abilities. She opined Allen would be able to lift less than ten pounds occasionally or frequently; stand/walk and sit, with normal breaks, for less than two hours each during an eight-hour workday; twist frequently, but never stoop/bend, crouch, or climb stairs or ladders. (A.R. 307-08) She opined Allen could reach, including overhead reaching, and perform pushing/pulling activities, but she could not perform handling, fingering, or feeling activities. She recommended Allen avoid even moderate exposure to extremes of heat and cold, and to hazards. (A.R. 308) She opined Allen could sit and stand for fifteen minutes at a time before changing positions. She indicated Allen must walk around every thirty minutes, but inexplicably indicated this would be for "0" minutes each time. (A.R. 309) She indicated Allen needs the ability to change positions from sitting to standing/walking at will, and Allen sometimes would need to lie down at unpredictable intervals during a work shift, as often as every thirty minutes.

In the section for an indication of medical findings that support these recommended limitations, Dr. Orsini noted: "Xray report - bilateral osteoarthritis L > R"; "Left medial collateral tear"; "Large [right] effusion"; and "Bone infarct distal [left] femoral shaft." (*Id.*) The doctor noted Allen has a history of

13 - FINDINGS & RECOMMENDATION

"lupus and arthritis affected by environment." (A.R. 310)   Based on Allen's knee x-rays, the doctor opined Allen would need assistive devices for ambulation; need to elevate her legs; and be limited in her ability to kneel, crawl, and balance.   She further checked the form to indicate Allen would have problems "seeing, hearing or speaking."[8]   (*Id.*)   She opined Allen would be absent from work due to her impairments "[m]ore than three times a month." (*Id.*)

Both the July 3, 2010, "Verification of Disability," and the July 27, 2010, medical source statement were considered by the Appeals Council, which found the evidence did not warrant further review of the ALJ's decision.   (A.R. 1)

### B. Vocational Expert's Testimony

The VE described Allen's past relevant work as "grocery store cashier clerk," which is light, semi-skilled work with an SVP of 3.[9]   During part of her working career, she was a head cashier, which would still be semi-skilled, but with an SVP of 4.[10]

---

[8]This notation is not explained, and nothing like it appears elsewhere in the Record.

[9]"SVP" refers to the level of "specific vocational preparation" required to perform certain jobs, according to the *Dictionary of Occupational Titles*.   The SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or. Dec. 7, 2011) (Simon, J.) (citation omitted).   "The DOT identifies jobs with an SVP level of 1 or 2 as unskilled, jobs with an SVP of 3 or 4 as semi-skilled, and jobs with an SVP of 5 or higher as skilled." *Whitney v. Astrue*, slip op., 2012 WL 712985, at *3 (D. Or. Mar. 1, 2012) (Brown, J.) (citing SSR 00-4p).

[10]*Id.*

14 - FINDINGS & RECOMMENDATION

The ALJ asked the VE to consider an individual "with demonstrated exertional impairments reflecting a residual functional capacity such as that found [by Dr. Alley, a records-reviewing doctor; *see* A.R. 262-69, discussed *supra* at page 9]." (A.R. 56)  The VE stated such an individual could not return to Allen's past work.  (*Id.*)  However, the individual could perform other light work, both skilled and unskilled, that exists in significant numbers in the national economy.  The VE gave examples of information clerk, a sedentary job with an SVP level of 2; credit card clerk, "a call center application," a sedentary job with an SVP level of 2; self-service cashier, an unskilled, light job with an SVP level of 2; and electronics worker, a light job with an SVP level of 2.  (A.R. 57)

The VE stated if the individual would be absent from the workplace at unpredictable times, as much as four to eight hours a week, then the individual would not be able to do any type of gainful employment.  (A.R. 58)

### C.  Allen's Testimony

#### 1.  Hearing testimony

Allen stated she played basketball at Portland State University in 1979.  At that time, she weighed 130 pounds.  She is 5'3" tall, and at the time of the ALJ hearing, she weighed 348 pounds.  She took steroids during her freshman year at PSU "because of [her] lupus," and this caused her to begin gaining weight. (A.R. 32) Her weight gain has continued since that time, and poses problems for her.  She stated the last year she worked, she had to do a lot of bending, which was difficult due to her weight.

15 - FINDINGS & RECOMMENDATION

1    Allen belonged to a grocery employees' union for nineteen
2    years. Her last job was as head cashier at Fred Meyer, where she
3    worked for almost six years. (A.R. 33-34) She began having
4    problems with high blood pressure, and breathing problems due to
5    congestive heart failure, especially from repeated bending down.
6    (A.R. 34) She eventually "started cheating," by putting a grocery
7    bag into a cart, and filling the bag in the cart so she could avoid
8    having to lift a full bag. She stated this was against Fred
9    Meyer's policy. (A.R. 50-51) She also asked customers to leave
10   items in their carts so she could use the scanning 'gun,' rather
11   than lifting the items from the conveyor belt. (A.R. 51)

12       She did not tell her boss about her health problems "because
13   [she] was head cashier and [her] attendance was important to
14   [her]." (A.R. 34) In June 2007, she had high blood pressure and
15   some problems with her eyesight, and she was getting headaches.
16   She was terminated by Fred Meyer, apparently for failing to show up
17   at work without notifying her employer during the time she was ill.
18   The record is not entirely clear on the reason the employer cited
19   for her termination. She filed some type of wrongful termination
20   action with "Foley Bureau of Labor," and ultimately reached a
21   settlement with Fred Meyer for her back wages. She wanted to be
22   reinstated so she would still have insurance, but the settlement
23   did not include reinstatement. She applied for unemployment, which
24   Frey Meyer contested, but she ultimately prevailed and was able to
25   receive unemployment compensation. (A.R. 34-38) Allen stated that
26   if Fred Meyer had reinstated her, she had planned to use her
27   accumulated sick leave, and when it ran out, go on disability
28   because of her health. (A.R. 39)

16 - FINDINGS & RECOMMENDATION

Allen was still receiving unemployment compensation at the time of the hearing.  She complied with the job-search requirement by applying for jobs online.  However, according to her, when she explained her medical history, no one wanted to hire her.  (A.R. 42; *see* A.R. 40-42, 47)

Allen had a splenectomy in approximately 2002, when she was diagnosed with lupus.  (A.R. 43)  She also was having breathing problems at that time.  She stated she is a smoker, and she smoked when she was playing basketball in college.  By the time of the ALJ hearing, she was smoking about a third of a pack of cigarettes a day.  (A.R. 44)

In January 2009, Allen went to Las Vegas for her birthday.  While there, she developed pancreatitis and had surgery.  During that time period, she was using a patch to try to quit smoking, but the pills and patches were too expensive for her without insurance.  (A.R. 44-45)  She had just been admitted into the Oregon Health Plan to pay for a portion of her doctors' visits, but she still had to pay 100% of her prescription medications. (A.R. 45-46)

Allen stated due to pain in her knees, she could not do a job where she had to sit or stand all day long.  Sitting at the ALJ hearing caused her to have knee pain.  Her shortness of breath also is a problem for her.  in addition, she stated her pain medication (Vicodin, at the time of the hearing) causes problems with her attention and concentration.  She stated she has taken pain medication every day for seven years.  (A.R. 48-50)

Allen stated her doctors have told her that if she lost weight, it would help her high blood pressure.  She swims almost every day for exercise.  (A.R. 50)  She walks very little, noting

17 - FINDINGS & RECOMMENDATION

that just the walk from the elevator to the hearing room caused her
to be short of breath.  If she has to do a task such as washing
dishes, she rests frequently during the task, leaning on the sink
or the counter.  She spends a lot of time during the day lying
down, which she stated relieves her pain at least from a
psychological standpoint because she knows that when she is
standing, she is in pain.  (A.R. 52-53)  The continuing decline in
her health scares her.  (A.R. 54)  She isolates herself from other
people.  Allen stated she would seek psychiatric help if she had
insurance, but she cannot afford it.  (A.R. 54)

**2.  *Written testimony***

On August 21, 2007, Allen submitted a Function Report-Adult.
(A.R. 158-65)  Allen stated she lived alone in an apartment.  She
described her daily activities as follows: "I fix breakfast, sit in
my recliner[,] watch TV[,] fix lunch[,] watch TV, fix dinner then
bed.  I do take a shower.  I can no[t] sit in tub."  (A.R. 158)
She indicated she cares for her cat by providing food and water.
She used to be able to "do a lot of walking or standing," and clean
her house, but she is unable to do these things now.  Her leg pain
sometimes keeps her awake at night.  Her knees ache, and she has
difficulty putting on pants.  She is unable to sit in a tub because
she cannot get out.  She has trouble rising from the toilet without
assistance.  She is able to feed herself and care for her personal
hygiene needs.  (*Id.*)

Allen stated she prepares meals such as "salads, soups,
sandwiches, hot dogs, bake[d] potatoes [and] items [she] can cook
in [the] microwave."  (A.R. 160)  She uses the microwave "daily,"

18 - FINDINGS & RECOMMENDATION

indicating she is unable to stand over a stove, or "do a lot of chopping." (*Id.*) She does her own laundry, but one load takes her half a day. She has problems taking out the trash because it involves going down stairs. She gets out of breath when she does the laundry or takes out the trash. (*Id.*) She avoids doing housework because she gets depressed, knowing her knees will hurt when she is through. She does not go out except to the grocery store, which she does once or twice a month with the assistance of her daughter or a friend. (A.R. 161) She is able to manage her own money, but needs help "getting bills paid at their location." (A.R. 161-62)

Allen spends her time watching television, sleeping, and eating. She stated sleeping and sitting keep the pressure off of her legs and knees. She is "unable to walk, stand, for long periods," and she has trouble sleeping at times due to pain. She occasionally goes to her sister's house, but generally leaves her home only once or twice a month to pay bills or buy groceries. (A.R. 162)

Regarding her functional abilities, Allen indicated lifting hurts her legs and knees. She stated, "I can't squat at all because my knees wont' let me. Bending hurts my back if I bend over and over. Standing hurt[s] my knees and lower back. Walking for some time hurts my knees and my breathing is short. Sitting hurt[s] my knees. Stair climb takes my breath away and hurt[s] my knees." (A.R. 163) Allen indicated she has no mental problems. She follows written and spoken instructions very well, and gets along well with authority figures. She handles changes in routine well, but she experiences stress if her blood pressure rises. She

19 - FINDINGS & RECOMMENDATION

has noticed some (unspecified) changes in her behavior due to her pain medication. Allen wears glasses with prescription lenses. (A.R. 164)

Allen also completed a Pain Questionnaire in connection with her applications. (A.R. 166-68) She stated she has pain in her knees, legs, hips, back, and chest. The pain is present constantly. Her pain is worse if she walks, bends, steps, or kneels, or when she has no pain medication. If she sits or bends, she has difficulty getting up. The only thing that helps her pain is medication, and she takes Tylenol #3, oxycontin, and Percocet. (A.R. 166-67) The medications make her drowsy and dizzy, give her a dry mouth, and cause her to sleep for long periods. (A.R. 167) She can be active for only about an hour at a time before she has to rest. She is unable to finish house cleaning tasks all at one time. (*Id.*) She stated her daughter helps her with household tasks, indicating, "My daughter has been my legs. She helps me considerably." (A.R. 168)

Allen stated she used to play college basketball, run, and jump, but she is no longer able to do these activities. (A.R. 167) She no longer engages in hobbies due to pain in her legs, knees, and back. (A.R. 168)

Allen completed a Work History Report. She indicated she worked for Fred Meyer from November 2001 to June 2007. She was Head Cashier, and worked forty hours per week. The job required her to lift groceries, including forty-to-fifty-pound bags of dog food and other heavy items. She spent almost all of her time on her feet in the job. (A.R. 171-72)

From 1997 to 2001, Allen worked forty hours a week providing in-home care for individuals through an aging and disability service. She assisted clients, administering medications, giving baths, fixing meals, and the like. She assisted clients in going to the restroom, taking showers, and changing bandages. The job required her to lift only about ten pounds. She spent the majority of her time on her feet, with some kneeling, reaching, grasping, and handling tasks. (A.R. 171, 173)

From 1989 to 1995, Allen worked about ten hours a week as a cashier at a grocery store. She checked and bagged groceries, and unloaded produce. She was required to lift up to fifty pounds occasionally, and twenty-five pounds frequently. (A.R. 171, 174)

At the time Allen appealed the ALJ's decision to the Appeals Council, a "Disability Report-Appeal" was completed by the Social Security Administration, presumably from an interview with Allen. (A.R. 194-200) Allen indicated her condition had gotten worse, and she was going to the ER at least once a month. She stated, "My condition is worse because I can't afford my medications so I have more joint pain. I can't walk up and down the stairs. I have a hard time getting out of bed due to painful joints and knees. I have knee swelling and it makes it hard to move to do my [c]hores or take care of myslef [sic]. I can't move my legs. My blood pressure is over 200 or higher." (A.R. 194) Allen had moved in with a friend because she had become unable to take care of her apartment. She indicated she could not do any shopping, household chores, laundry, cooking, or cleaning. She was still able to care for her personal hygiene. She stated, "It [is] hard for me to bend my knees [because] they don't bend well and I don['·]t feel like my

legs can hold my weight when I go up and dow[n] the stairs." (A.R. 198)  She was living in an upstairs apartment, and because of her difficulty with stairs, she stated she was "homebound," except when she had doctors' appointments.  (*Id.*)

### III.   *DISABILITY DETERMINATION AND THE BURDEN OF PROOF*

#### *A.   Legal Standards*

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act."  *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regula- tions?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet

22 - FINDINGS & RECOMMENDATION

the burden at any of those four steps, then the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

The ALJ determines the credibility of the medical testimony and also resolves any conflicts in the evidence. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Ordinarily, the ALJ must give greater weight to the opinions of treating physicians, but the ALJ may disregard treating physicians' opinions where they are "conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings." *Id.* (citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149

23 - FINDINGS & RECOMMENDATION

1    (9th Cir. 2001)).    If the ALJ disregards a treating physician's

2    opinions, "'the ALJ must give specific, legitimate reasons'" for

3    doing so.   *Id.* (quoting *Matney*).

4        The law regarding the weight to be given to the opinions of

5    treating physicians is well established.    "The opinions of treating

6    physicians are given greater weight than those of examining but

7    non-treating physicians or physicians who only review the record."

8    *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir.

9    2003).    The *Benton* court quoted with approval from *Lester v.*

10   *Chater*, 81 F.3d 821, 830 (9th Cir. 1995), where the court held as

11   follows:

12           "As a general rule, more weight should be
             given to the opinion of a treating source than
13           to the opinion of doctors who do not treat the
             claimant.    At least where the treating
14           doctor's opinion is not contradicted by
             another doctor, it may be rejected only for
15           'clear and convincing' reasons.    We have also
             held that 'clear and convincing' reasons are
16           required to reject the treating doctor's
             ultimate conclusions.    Even if the treating
17           doctor's opinion is contradicted by another
             doctor, the Commissioner may not reject this
18           opinion without providing 'specific and legi-
             timate reasons' supported by substantial
19           evidence in the record for so doing."

20   *Id.* (quoting *Lester, supra*).

21        The ALJ also determines the credibility of the claimant's

22   testimony regarding his or her symptoms:

23           In deciding whether to admit a claimant's sub-
             jective symptom testimony, the ALJ must engage
24           in a two-step analysis.   *Smolen v. Chater*, 80
             F.3d 1273, 1281 (9th Cir. 1996). Under the
25           first step prescribed by *Smolen*, . . . the
             claimant must produce objective medical
26           evidence of underlying "impairment," and must
             show that the impairment, or a combination of
27           impairments, "could reasonably be expected to
             produce pain or other symptoms." *Id.* at 1281-
28           82.   If this . . . test is satisfied, and if

24 - FINDINGS & RECOMMENDATION

> the ALJ's credibility analysis of the
> claimant's testimony shows no malingering,
> then the ALJ may reject the claimant's testi-
> mony about severity of symptoms [only] with
> "specific findings stating clear and con-
> vincing reasons for doing so." *Id.* at 1284.

*Batson*, 359 F.3d at 1196.

### B.  The ALJ's Decision

The ALJ found Allen has not engaged in substantial gainful activity since her alleged onset date of June 9, 2007.  He found her to have severe impairments consisting of "obesity and patellofemoral syndrome," but he further found these impairments, singly or in combination, do not meet or equal a Listed impairment. (A.R. 13)  The ALJ noted that although obesity is no longer a listed impairment in the regulations, he nevertheless factored in Allen's obesity in his assessment, and even if obesity were added to her impairments, the combination of her impairments still would not meet or medically equal a listed impairment.  (A.R. 13-14)

The ALJ found Allen has the residual functional capacity to perform light work, with the following limitations:

> [L]imited to standing and/or walking for no more
> than two of eight workday hours, sitting for about
> six of eight workday hours, and lifting and/or
> carrying should be restricted to twenty pounds
> frequently and ten pounds occasionally.  Also,
> [she] should only occasionally climb ramp/stairs,
> but should never climb ladder/rope/scaffolds.
> Additionally, [she] should be restricted to per-
> forming tasks requiring no more than occasional
> balancing, stooping, kneeling, crouching, and
> crawling.

(A.R. 14)

In reaching his RFC assessment, the ALJ indicated he had considered all of Allen's alleged symptoms and resulting

25 - FINDINGS & RECOMMENDATION

limitations.  He found Allen's subjective complaints regarding the
intensity, persistence, and limiting effects of her symptoms to be
credible only insofar as they are consistent with the ALJ's RFC
assessment.   (A.R. 14-15)   Specifically, the ALJ found that
although Allen "suffers from some type of impairment," her claim
that she is incapable of all types of work activity is unconvincing
"as the evidence in the record reflects [Allen's] functional
limitations are not as significant and limiting as have been
alleged."  (A.R. 15)

        As support for his credibility finding, the ALJ noted Allen
lives alone and does not require assistance caring for her personal
needs or self-care.  She "prepares daily meals, performs housework,
takes care of a cat, does her own shopping, and when she goes out
she can do so alone, either driving, taking public transportation,
or walking."  (*Id.*)  He noted that although Allen claims she tires
easily after walking for ten minutes, she "testified that she
exercises regularly, doing water aerobics daily, which is also
supported by her medical record[.]"  (*Id.*)  He noted Allen has no
problems getting along with coworkers, supervisors, or the public,
or there is no evidence that her ability to communicate clearly,
her memory, or her ability to follow instructions has been affected
by her impairments.  The ALJ concluded that "[c]ollectively, this
evidence indicates [Allen's] activities of daily living, social
functioning and concentration, persistence and pace, are not
limited to the extent one would expect given her complaints of
disabling symptoms and limitations, and further suggests [her]
alleged impairments do not result in a significant functional

limitation that precludes her from engaging in basic work activity." (*Id.*)

The ALJ also found it significant that the Record indicates Allen "stopped working for reasons unrelated to an alleged impairment." (*Id.*) He noted Allen worked at Frey Meyer for six years, during which her allegedly-disabling impairments were present. Allen testified she was terminated for missing work without giving notice that she would be absent, and she was terminated for this misconduct. Although she settled an unlawful termination action, she was not reinstated as she desired. The ALJ concluded the record evidence "is fairly conclusive by [Allen's] own admission that her health was not the cause of her unemployment at the time of her alleged onset date," which corresponded with her termination date from Fred Meyer. (*Id.*) In addition, Allen has been receiving unemployment benefits since her termination, "and has been regularly applying for jobs, suggesting that if [she] is actively seeking employment, then she must also be capable of performing work-related tasks." (*Id.*) He noted no doctor had placed any restrictions on Allen, or had indicated Allen was disabled.[11] Dr. Lyon expressly refused to support Allen's "quest for disability, stating that based on [her] skills and good education, she should be able to find work." (A.R. 16)

The ALJ further noted Allen has been treated conservatively by her doctors for her allegedly disabling symptoms, and her trips to the doctor have been infrequent. (*Id.*) Her hypertension is controlled by medication when it is taken as directed. Her

---

[11]The ALJ did not have Dr. Orsini's records at the time he prepared his written opinion.

27 - FINDINGS & RECOMMENDATION

shortness of breath is not caused primarily by congestive heart failure, with the evidence suggesting it may, instead, be caused by allergies and by her continued smoking. In addition, the ALJ noted a consulting "rheumatologist" had opined Allen's knee and ankle pain likely was not attributable to lupus, and questioned whether that diagnosis even was correct. Instead, the "rheumatologist" opined her knee and ankle pain likely was due to her obesity and osteoarthritis.[12] The ALJ concluded, "Collectively, [Allen's] treatment record suggests her alleged disabling symptoms are not particularly serious and not as limiting as [she] has alleged in connection with this application." (Id.)

Because no treating source had offered an opinion supporting Allen's "allegations of disabling functional limitations caused by her various medical conditions," the ALJ relied on the RFC assessment performed by Dr. Alley, and gave his opinion "significant weight." (A.R. 16-17) The ALJ noted, "Although Dr. Alley was not an examining physician, his opinion is generally consistent with the evidentiary record and was supported by a critical evaluation of the medical evidence and the medical source statements in the record." (A.R. 17) The ALJ stated that in formulating his RFC assessment, he had given Allen "the maximum reasonable benefit of the doubt," but "the preponderance of the

---

[12]The exhibit cited by the ALJ in support of this finding is the office notes of NP Probst, not to any consultation by a rheumatologist. The Commissioner also argues Allen's "rheumatology specialist expressed uncertainty" about the lupus diagnosis. Dkt. #19, p. 8. Allen was not seen by a rheumatologist for consultation, only by the nurse practitioner, and it was NP Probst who offered this opinion. (See A.R. 234-37)

28 - FINDINGS & RECOMMENDATION

medical evidence fails to support the contention that [she] can do no work at all." (*Id.*)

The ALJ found Allen is unable to perform her past relevant work, but at her age, and with her education, work experience, and RFC, she can perform unskilled sedentary and light work that exists in substantial numbers in the national economy.  He relied on the VE's testimony in concluding Allen can make a successful adjustment to work in that range, giving examples of information clerk, credit card clerk, self-service cashier, and electronics worker.  (A.R. 18)  He therefore concluded Allen had not been under a disability from June 9, 2007, through January 14, 2010.  (A.R. 18-19)

## IV.  STANDARD OF REVIEW

The court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *accord Black v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1 (9th Cir. May 20, 2011).  Substantial evidence is '"more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'"  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court

29 - FINDINGS & RECOMMENDATION

1    must consider the entire record, weighing both the evidence that
2    supports the Commissioner's conclusions, and the evidence that
3    detracts from those conclusions. *Id.* However, if the evidence as
4    a whole can support more than one rational interpretation, the
5    ALJ's decision must be upheld; the court may not substitute its
6    judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v.*
7    *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

8

9                              *V. DISCUSSION*

10        Allen argues the ALJ misstated the evidence in several
11   respects. First, she disputes the ALJ's findings regarding her
12   functional abilities. The ALJ stated Allen "has reported she lives
13   by herself and does not report needing any particular assistance
14   taking care of her personal needs or self-care. [She] has stated
15   she prepares daily meals, performs housework, takes care of a cat,
16   does her own shopping, and when she goes out she can do so alone,
17   either driving, taking public transportation or walking." (A.R.
18   15) Allen argues she "maintains an apartment, but lives with a
19   friend who has an adult foster care home . . . where she has her
20   own room due to her <u>inability</u> to perform [activities of daily
21   living]." Dkt. #18, ECF p. 6 (emphasis in original). She also
22   asserts that in stating she can "shop alone," she "failed to
23   expound that 'shopping alone' includes the use of her handicap
24   parking sticker for close parking, the use of a walker . . ., a
25   mobility cart while in the store, and assistance from a store
26   employee for reaching while shopping and loading the groceries into
27   the car." Dkt. #18, ECF p. 6. In support of her arguments, Allen
28   cites the Disability Report-Appeal prepared by the Agency at some

1  point following the initial and reconsideration denials of her
2  applications for benefits (A.R. 198), as well as additional
3  exhibits submitted by Allen with her initial and reply briefs, Dkt.
4  ##18 & 23.

5     With regard to the ALJ's finding that Allen "has reported"
6  living alone and not needing assistance to care for herself, the
7  court notes Allen made those representations at the time of her
8  initial applications for benefits. *See* A.R. 158-59. When Allen
9  made the statements reported on the Disability Report-Appeal, she
10 indicated she had moved in with a friend because she was unable to
11 take care of her apartment. She indicated her roommate did all of
12 "the shopping, household chores, laundry, cooking and cleaning,"
13 and all Allen was able to do was care for her personal hygiene
14 needs. (A.R. 198)

15    The Disability Report-Appeal is not dated or signed, and it is
16 difficult to determine when it was submitted to the Agency. On the
17 form, Allen indicated her last doctor's visit was in April 2008,
18 when she was seen for "joint pain and chest pain," treated in the
19 ER with "medication and xrays." (A.R. 196) However, the Record
20 contains no treatment notes from an ER visit in April 2008.
21 Indeed, Allen indicated she was going to the ER at least once a
22 month, but there are no ER records at all from this time period.
23 Similarly, the form shows a visit to the Old Town Clinic in March
24 2008, for shortness of breath and congestive heart failure, when
25 Allen was treated with "medication for heart." (*Id.*) Again, no
26 treatment notes appear in the Record for a doctor's visit in March
27 2008. Because the Record contains treatment and progress records
28 from February 2008, and then from August 2008, through at least

31 - FINDINGS & RECOMMENDATION

November 2009, it would appear the form was submitted sometime between February and August 2008. In that case, the ALJ would have had the benefit of the form at the time he made his decision, yet he did not discuss Allen's representations shown on the form, and made a finding that Allen was living alone with minimal assistance. This oversight is troubling. If the ALJ discredited Allen's updated complaints, he was required to provide clear and convincing reasons for doing so (absent evidence of malingering, which is not clearly present in this case[13]). *See Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The ALJ's findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). If, on the other hand, the form was not part of the Record before the ALJ, then it should have been considered by the Appeals Council, but it does not appear on the list of additional evidence the Appeals Council considered. (*See* A.R. 4)

The court finds the Agency's failure to address Allen's updated complaints was error. Her change in circumstances, coupled with the medical source statement from Dr. Orsini, her new treating physician, indicate her condition had deteriorated significantly since the time of the ALJ hearing, which could impact the ultimate

---

[13]Although records-review consultant Dr. Alley did not expressly state Allen was malingering, he found the level of disability she alleged was "not supported by objective evidence." A.R. 269; *see* A.R. 270 (Dr. Berner's statement concurring with Dr. Alley's "opinion and credibility assessments"); A.R. 271 (Dr. Farwell's statement concurring with Dr. Alley's RFC determination).

determination regarding whether or not she is disabled as of some date.

Allen has submitted new evidence she asks the court to consider, consisting of the following:[14]

(1)  A statement authored by Dr. Orsini on January 11, 2011, stating Allen suffers from "severe osteoarthritis of her knees" that causes chronic pain, and makes it difficult for Allen to walk or sit for long periods of time; congestive heart failure; diabetes; hypertension; and lupus; all of which "make it impossible for her to maintain gainful employment."  Dkt. #18-1, p. 2.

(2)  A "Physician's Questionnaire for Verification of Disability for the Oregon Retail Employees Pension Trust[]," dated September 14, 2010, on which Dr. Orsini indicated she had seen Allen approximately monthly since December 1, 2009.  The doctor stated Allen has irreversible congestive heart failure, and incurable systemic lupus.  She indicated Allen cannot afford knee replacement surgery (although the court notes the Record contains no recommendations that she obtain such surgery), and she is "unable to walk without a walker, unable to stand or walk for extended periods of time, unable to sit for extended periods of time without significant pain, has not been able to support herself for past 3 years adequately due to many medical issues causing her to loose [sic] employment."  Dkt. #18-2, p. 2.  The doctor opined

---

[14]Two of the documents submitted by Allen (i.e., the "Verification of Disability" signed by Dr. Orsini on July 3, 2010; and Dr. Orsini's Medical Source Statement, dated July 27, 2010) were considered by the Appeals Council (*see* A.R. 4), and the court has discussed that evidence above, in the summary of Allen's medical history.  Those documents, therefore, do not constitute "new evidence," and are not listed here.

33 - FINDINGS & RECOMMENDATION

that Allen's "medical and physical disability make gainful employment at this time impossible for her." *Id.*, p. 3.  Dr. Orsini limited Allen to lifting no more than five pounds even occasionally, with only limited walking.  She noted Allen might benefit from physical therapy. *Id.*

    (3) A letter from the Oregon Retail Employees Pension Trust to Allen dated October 11, 2010, discussing her monthly pension payments.  Dkt. #18-2, p. 4.

    (4) A statement authored by Dr. Orsini on August 24, 2011, echoing the doctor's January 11, 2011, statement, with further information about the nature of lupus, and indicating Allen's "disability is expected to be permanent."  Dkt. #18-3.

    (5) A handwritten note from Angela R. [illegible surname] dated September 15, 2011, stating: "Carmen Allen was supposed to be a care giver for my foster son. Due to her chronic pain, she could not help and I ended up helping her with all of her ADL's, shopping, laundry - paying her bills and basically helping her out 80% of the time due to her pain.  I am still helping her out as she is medically disabled."  Dkt. #18-4.

    (6) A printout from Fred Meyer Pharmacy showing prescriptions filled by Allen from January 16 to December 24, 2011.  Dkt. #23, p. 11.

    (7) A printout from an unknown source showing medications prescribed for Allen from March 15, 2008, to December 24, 2011. Dkt. #23, pp. 12-13.

    (8) A radiology report from x-rays of Allen's knees, dated July 13, 2010, showing bilateral osteoarthritis, with "[m]ild joint space narrowing and mild-to-moderate osteophytosis" on the right,

34 - FINDINGS & RECOMMENDATION

1   and "[m]ild-to-moderate asymmetric joint space narrowing with
2   moderate osteophytosis" on the left; "old left medial collateral
3   ligament tear"; "[l]arge right effusion," with an MRI recommended
4   "for better evaluation if warranted"; and "[b]one infarct distal
5   femoral shaft," which also could be evaluated better with an MRI.
6   Dkt. #8, p. 7.

7       (9) Two letters from Allen's attorney to the Appeals Council
8   – one dated December 21, 2010, and another dated March 1, 2011 –
9   written following each of the Appeals Council's decisions, in which
10  the attorney requests a copy of the Record and an opportunity to
11  argue or brief the case before a final decision is made. Dkt. #8,
12  pp. 12 & 13.

13      The Commissioner asks the court to disregard this new evi-
14  dence, arguing Allen has not met her burden to show the evidence is
15  material, nor has she shown good cause for failing to submit the
16  evidence in a timely manner. Dkt. #19, pp. 5-8.

17      The statute providing for judicial review of the Commis-
18  sioner's final decisions specifies the court "may at any time order
19  additional evidence to be taken before the Commissioner of Social
20  Security, but only upon a showing that there is new evidence which
21  is material and that there is good cause for the failure to
22  incorporate such evidence into the record in a prior proceeding[.]"
23  42 U.S.C. § 405(g), sentence six. "To meet the materiality
24  standard, the 'new or additional evidence offered must bear
25  directly and substantially on the matter in dispute.'" *Wainwright*
26  *v. Sec'y of Health & Human Servs.*, 939 F.2d 680, 682 (9th Cir.
27  1991) (quoting *Ward v. Schweiker*, 686 F.2d 762, 764 (9th Cir.
28  1982)). Stated differently, "[e]vidence is material if there is a

35 – FINDINGS & RECOMMENDATION

1   reasonable possibility that such evidence would have changed the
2   outcome of the case." *Flores v. Sullivan*, 908 F.2d 976 (Table),
3   1990 WL 102786, at *3 (9th Cir. July 24, 1990) (citing *Booz v.*
4   *Sec'y of Health & Human Servs.*, 734 F.2d 1378, 1381 (9th Cir.
5   1984)).

6       Particularly when viewed in conjunction with Dr. Orsini's
7   medical source statement, the additional evidence Allen has
8   submitted bears directly and substantially on her case. Although
9   the new evidence is not dispositive, it reasonably could have
10  changed the outcome of the case. As such, the court finds the
11  evidence is material.

12      Allen did not mention, in her brief, any reason for her
13  failure to submit the new evidence sooner. However, she first
14  submitted the new evidence by way of a letter, docketed in the case
15  as a "Supplement" to her Complaint. Dkt. #8. In the letter, she
16  states the new evidence (obviously excluding the two letters from
17  her attorney to the Appeals Council) was either overlooked or not
18  presented by her attorney in the Agency proceedings. *Id.*, p. 1.
19  Construing Allen's *pro se* filings liberally, the court finds her
20  attorney's failure to submit the evidence constitutes good cause
21  justifying its consideration. *See Robertson v. Wells Fargo Home*
22  *Mortg.*, slip op., 2011 WL 5157772, at *4 (D. Or. Oct. 28, 2011)
23  (Brown, J.) ("the court must construe *pro se* filings liberally");
24  *McCabe v. Arave*, 827 F.2d 634, 640 n.6 (9th Cir. 1987) ("[C]ourts
25  are to make reasonable allowances for *pro se* litigants and to read
26  *pro se* papers liberally.").

27      In addition, as Judge King of this court has observed, "If the
28  evidence did not exist prior to the Secretary's final decision,

36 – FINDINGS & RECOMMENDATION

1   good cause exists for the plaintiff's failure to present the

2   evidence." *Ready v. Astrue*, slip op., 2012 WL 171291, at *6

3   (D. Or. Jan. 20, 2012) (citing *Burton v. Heckler*, 724 F.2d 1415,

4   1418 (9th Cir. 1984)). The Appeals Council initially denied

5   Allen's request for review on October 27, 2010. The new evidence

6   listed in paragraph (2), a portion of the prescription printout in

7   paragraph (6), and the x-ray report in paragraph (8), could have

8   been obtained prior to that time, although it is questionable

9   whether Allen would have known of, and/or had the opportunity to

10  submit, Dr. Orsini's questionnaire listed in paragraph (2) in time

11  for consideration by the Appeals Council. The remaining evidence

12  (again excluding counsel's letters) post-dates the Appeals

13  Council's final decision. Although the Appeals Council later set

14  aside its decision for the purpose of considering Dr. Orsini's July

15  2010 medical source statement, there is no indication in the Record

16  that Allen knew the Appeals Council was taking a second look at her

17  case (despite her attorney's request that the Appeals Council do

18  so, and allow argument or briefing prior to issuing a decision).

19  The court therefore does not fault Allen for failing to submit the

20  remaining new evidence prior to the February 21, 2011, Appeals

21  Council denial.

22      Allen also argues the ALJ erred in rejecting her diagnosis of

23  lupus, and in failing to find lupus is a severe impairment. During

24  the hearing, the ALJ stated the Record contains "no evidence" of

25  Allen's lupus diagnosis, and "most people don't think she really

26  ever had lupus, or if she did, she doesn't have it any longer."

27  (A.R. 30) The ALJ's statement does not reflect the Record

28  accurately. The Record contains the results of a single ANA test,

performed on June 25, 2007, that was negative. Nevertheless, Allen's treating physician at the time, Dr. Grace, listed "Lupus Erythematosus-Systemic" as one of Allen's current conditions, by history, with an onset date in 1979. Allen's doctors have treated her inflammation and pain symptoms with narcotic pain relievers for many years, and all of her treating physicians since that time have listed lupus as a diagnosis, by history - albeit apparently without any corroborating laboratory test results. The only individual to question lupus as a diagnosis was consulting Nurse Practitioner Kevin Probst, on August 14, 2007. NP Probst opined Allen's knee and ankle pain could be due to osteoarthritic changes and obesity. (A.R. 235) The opinion of this single nurse practitioner hardly amounts to "most people" not thinking Allen "really ever had lupus." However, the lack of corroboration of the diagnosis reported by Allen, and the lack of current steroid treatments, do raise questions. The ALJ erred in discrediting the ongoing diagnosis of lupus by Allen's treating sources without further investigation or development of the Record.

Upon remand, the ALJ should be directed to consider Allen's Disability Report-Appeal, the July 2010 statements from Dr. Orsini, and the new evidence submitted to this court, as well as developing any further evidence that will provide a full and complete Record. Among other things, the ALJ should develop the Record further regarding Allen's lupus diagnosis. *See Hayes v. Astrue*, 270 Fed. Appx. 502, 504 (9th Cir. 2008) ("'In Social Security cases, the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered[.]' . . . even

when the claimant is represented by counsel.") (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) (per curiam)).

### *VI.   CONCLUSION*

For the reasons discussed above, I recommend the Commissioner's decision be reversed, and the case be remanded for further proceedings consistent with this opinion.

### *VII.   SCHEDULING ORDER*

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due by **July 6, 2012**.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.  If objections are filed, then any response is due by **July 23, 2012**.  By the earlier of the response due date or the date a response is filed, the Findings and Recommendations will go under advisement.

IT IS SO ORDERED.

Dated this <u>18th</u> day of June, 2012.


    <u>/s/ Dennis James Hubel</u>
Dennis James Hubel
Unites States Magistrate Judge

39 - FINDINGS & RECOMMENDATION